## Bristol-Myers Co. v. Lit Brothers, Inc. No. 1

*Truscott, Trinkle & Wright,* for plaintiff.
*Sundheim, Folz & Sundheim,* for defendant.

OLIVER, P. J., June 24, 1938.—This matter came on for hearing before Oliver, P. J., sitting in equity, on January 7, 1938.

The pleadings consist of the bill and answer. The bill seeks to restrain an alleged violation of the Pennsylvania Fair Trade Act of June 5, 1935, P. L. 266. Plaintiff is Bristol-Myers Company, a New Jersey corporation, and defendant, Lit Brothers, Inc., is a Pennsylvania corporation, which maintains a department store in the City of Philadelphia. The bill alleges that plaintiff is the producer of certain commodities offered for sale by the drug trade, the labels of all of which bear plaintiff's name and trade-marks, which products are in fair and open competition with products of the same general class produced by others; that defendant is one of the retail dealers in Pennsylvania selling the trade-marked goods of plaintiff; that plaintiff had previously entered into written contracts with various dealers in Pennsylvania to whom it

sold its commodities, which contracts fixed fair and reasonable minimum resale prices therefor in accordance with the Pennsylvania Fair Trade Act, supra, and the Act of Congress, known as the Tydings-Miller Act of August 17, 1937, 50 Stat. at L. 693; that defendant had notice of these contracts; and that defendant, although offering for sale and selling these products at their stipulated retail prices, nonetheless violated the Fair Trade Act because it issued and delivered to purchasers of the articles, as part of the purchase, trading stamps redeemable for merchandise of value, and because it advertised the issuance of trading stamps with every purchase of 10 cents or over.

The answer denied that defendant had made or is making any sales of plaintiff's products, after notice, at less than the retail prices therefor fixed by plaintiff, and averred, on the contrary, that defendant had been and is selling said products at the prices stipulated by plaintiff and that the trading stamps were issued, and are being issued, solely for advertising purposes and in accordance with an established policy of defendant which has continuously been in effect for more than 30 years. Defendant further averred that the trading stamps in and of themselves have no value and that any of such stamps issued in connection with the sale of plaintiff's products of themselves cannot be redeemed for any article of value. Defendant denied having committed any unlawful acts or having damaged plaintiff's system of doing business or having deprived plaintiff of the benefit of the Fair Trade Act of Pennsylvania or of the act of Congress.

### Findings of fact

The chancellor makes the following findings of fact:

1. That plaintiff is a New Jersey corporation, having its plant and factory in the State of New Jersey, and its selling offices in the City of New York, State of New York.

2. That defendant is a Pennsylvania corporation duly authorized to transact business in the City of Philadel-

phia, Commonwealth of Pennsylvania, maintaining a department store and offices situate at Eighth and Market Streets, Philadelphia.

3. That plaintiff is the producer of certain commodities offered for sale by the drug trade. These commodities more particularly are: Analka, Gastrogen Tablets, Ingram's Milkweed Cream, Ingram's Shaving Cream, Ipana Tooth Paste, Minit-Rub, Mum, Sagraphen, Sal Hepatica, Vitalis, and Ziratol, and the labels of which bear plaintiff's corporate name, Bristol-Myers Company, and its trade-mark.

4. That said trade-marks are the exclusive property of plaintiff, being registered in the United States Patent Offices under the following numbers: Analka, 105416; Gastrogen Tablets, 53030; Ingram's Milkweed Cream, 52177; Ingram's Shaving Cream, 136478 (Class 6), and 253700 (Class 4); Ipana Tooth Paste, 105039; Minit-Rub, 296865 and 309924; Mum, 72837; Sagraphen, 91642; Sal Hepatica, 51922; Vitalis, 271624 and 333125; and Ziratol, 100260. Said registration is now outstanding, validly subsisting, unrevoked and uncanceled, and plaintiff is the owner thereof.

5. That said commodities produced by plaintiff, Bristol-Myers Company, are in fair, free, and open competition with products of the same general class produced by others.

6. That plaintiff maintains a stock of its said trade-marked commodities and ships the same in interstate commerce to various jobbers as well as to various retail dealers in Pennsylvania.

7. That among said retail dealers selling the trade-marked goods of plaintiff corporation is defendant, Lit Brothers, Inc.

8. That plaintiff has one manufacturing plant in the United States, at Hillside, New Jersey, and all merchandise sold by it in the United States originates at that point and is distributed from there. Plaintiff has sales representatives in various States who call upon the

wholesale and retail trade. Said representatives appoint recognized wholesale drug houses as distributors of plaintiff's merchandise in various States. The wholesaler buys plaintiff's goods from this representative. The representative also calls upon the retail trade, obtains orders from retailers and turns these over to the wholesaler for execution. In addition, plaintiff sells to large retailers in each State on a direct basis, making shipments directly to them from New Jersey for sale to the consumer.

9. That defendant is one of the large retailers to which plaintiff sells directly. Plaintiff ships goods to defendant from Hillside, N. J., and defendant pays plaintiff directly.

10. That at all times hereinafter mentioned, plaintiff had previously entered into written contracts with various retail dealers in Pennsylvania, to whom its said trade-marked commodities were sold. Said contracts were of the same tenor and effect as that set forth in the specimen thereof, hereto attached, and stipulated the respective minimum resale prices for said commodities in accordance with the Pennsylvania Fair Trade Act of June 5, 1935, and the Act of Congress known as the Tydings-Miller Act of August 17, 1937, supra.

11. That the minimum resale prices therein stipulated, as aforesaid, are fair and reasonable.

12. That 65 percent of such retail dealers in plaintiff's said commodities in Pennsylvania have executed said contracts and sell said trade-marked commodities in pursuance thereof, and of the existence of said contracts defendant had full knowledge and notice at all times hereinafter mentioned.

13. That on or about October 22, 1937, defendant was duly notified by plaintiff and at all times thereafter had full notice and knowledge that various retail dealers in plaintiff's said trade-marked commodities in Pennsylvania had entered into said contracts with plaintiff and had full notice and knowledge of the resale prices therefor which were therein stipulated and which, under and

by virtue of the provisions of the said Pennsylvania Fair Trade Act, and said Act of Congress in such cases made and provided, governed the resale by defendant at retail of all the trade-marked products or commodities of plaintiff specified in said contracts.

14. That in the early part of October 1937 Nevin Drug Company, which is known as a cut-rate store, complained to plaintiff about the distribution of trading stamps by defendant with merchandise purchased from defendant.

15. That on or about October 22, 1937, plaintiff duly informed defendant that plaintiff regarded the issuance of trading stamps by defendant with sales of plaintiff's merchandise as a violation of plaintiff's contracts with other retailers and requested defendant to stop issuing trading stamps with plaintiff's products.

16. That defendant advised plaintiff that it had conformed to the prices for plaintiff's products as fixed in plaintiff's contracts with others and that defendant did not regard its issuance of trading stamps as a violation of the Pennsylvania Fair Trade Act and would therefore not discontinue issuing such stamps.

17. That thereupon plaintiff caused certain purchases of its products to be made from defendant on October 27, 1937, October 28, 1937, December 8, 1937, and December 9, 1937.

18. That plaintiff's products were sold by defendant on those occasions at the prices stipulated in plaintiff's contracts, but in each instance the purchaser received trading stamps from defendant.

19. That plaintiff has no fault to find with defendant except as regards the issuance of trading stamps.

20. That subsequently to plaintiff's being advised that defendant was continuing and intended to continue to give trading stamps with plaintiff's products, plaintiff continued to sell its merchandise to defendant. Defendant gave orders to plaintiff for merchandise on September 13, 1937, in the sum of $264.86, on October 11, 1937, in the sum of $284.49, on November 2, 1937, in the sum of

$178.41, on November 10, 1937, in the sum of $179.18, and on December 11, 1937, in the sum of $178.84. The merchandise covered by these orders was delivered by plaintiff to defendant respectively on or about September 16, 1937, October 14, 1937, November 4, 1937, November 15, 1937, and December 15, 1937.

21. That defendant never had any written contract with plaintiff under which plaintiff agreed to furnish it with merchandise, and plaintiff could have discontinued and can discontinue supplying defendant with merchandise at any time.

22. That after defendant had notice or knowledge that plaintiff had entered into contracts with others fixing the resale price of plaintiff's products, it always sold Ipana Tooth Paste at 39 cents a tube and Sal Hepatica at 25 cents per portion, the resale prices fixed by plaintiff in contracts with others for these products in the sizes handled by defendant.

23. That defendant at no time entered into a contract with plaintiff in the form of plaintiff's exhibit no. 1.

24. That defendant has been giving out trade stamps with purchases of merchandise for 30 years.

25. That a customer of defendant's, requesting stamps, is entitled to receive one stamp for each 10-cent purchase, irrespective of the article purchased. In no instance is a purchaser entitled to receive more than one stamp for each 10-cent purchase.

26. That giving of stamps is never advertised or connected in any way with any particular article. The advertising is always in connection with all articles sold by defendant.

27. That trading stamps are not given out by defendant automatically, but must be requested by the customer who must secure them from a separate department, removed from the place where purchases are made.

28. That on credit sales the customer must also request the stamps and is only entitled to them if the bill is paid when due.

29. That these stamps are redeemable only by the Yellow Trading Stamp Company. They are not redeemable on defendant's premises. Defendant has no connection with Yellow Trading Stamp Company except its contractual relationship in respect to the issuance and redemption of stamps. Defendant has no financial interest in Yellow Trading Stamp Company. No officers, directors, or principal stockholders of defendant are stockholders in the Yellow Trading Stamp Company.

30. That under the contract between defendant and Yellow Trading Stamp Company, defendant pays for the printing of stamps that are distributed by defendant. Yellow Trading Stamp Company prints the books which are used to hold the stamps at its own expense.

31. That defendant only pays Yellow Trading Stamp Company for stamps which are actually redeemed, at the rate of $1.40 per thousand stamps.

32. That defendant considers trading stamps as an advertising medium, exclusive with defendant in Philadelphia insofar as a department store is concerned. The expenses in connection with trading stamps are and always have been carried on defendant's books as advertising or publicity. If trading stamps constituted a discount on sales, they would be carried on defendant's books as part of the cost of the merchandise.

33. That the purpose of the issuance of trading stamps is to attract people into the store and to keep them coming into the store, for the same reason that goods are sold on the instalment plan. Goods are sold on the instalment plan by defendant because of the continuity of the customers' visits to the store over the period for which they are paying for the merchandise and defendant hopes that the customers will contract the habit of doing business with it and upon these visits buy other merchandise.

34. That before a customer can receive sufficient stamps to obtain anything, he must fill a book, and a book represents the purchase of $99 worth of merchandise.

35. That defendant's policy with respect to the issuance of trading stamps did not change following the enactment of the Fair Trade Act of 1935, and the receipt of notices from plaintiff that it had entered into contracts with others fixing the resale prices of its products. Defendant continued as always to give out stamps, upon request of its customers, with all merchandise purchased, and at no time within recent years attempted to push particular articles by giving out more trading stamps with such articles than one stamp for each 10-cent purchase.

36. That in addition to the giving of stamps, defendant uses many other forms of advertising media to attract business, including free hospitalization for customers who may become ill in the store; some 28,000 cases are treated during the course of the year; free telephone service to the store, for customers who live in suburban districts, free parking facilities, free delivery service within a radius of 100 miles of Philadelphia, free charge account privileges, free alterations to purchasers of men's clothing, free tickets to Philadelphia Orchestra concerts held at the Dell throughout the summer, free gift boxes and special wrapping for merchandise purchased. All of the above services cost defendant money but are maintained in order to attract customers to the store.

37. That the store has approximately 250,000 charge account customers, of which approximately 90,000 to 100,000 are active every month. Customers are not charged interest if they do not pay their bills on time. Defendant is compelled to borrow money and to pay interest thereon in order to finance these accounts.

38. That if an injunction were granted in this case, it would have a very serious effect on the operation of defendant's business. Defendant regards trading stamps as one of the foundations on which its business is built. There is no way that defendant could issue trading stamps only with merchandise not affected by the Fair Trade Act because this would necessitate an examination

of 100,000 charge account bills a month, item for item, for the purpose of determining with which merchandise trading stamps could be given. There are 533,000 to 600,000 items per month billed to customers.

39. That it would not be practically possible to examine all of the items on these bills in order to pick out the merchandise for which stamps could be given.

40. That such a procedure would develop ill will on the part of the customers. Even if a customer pays a bill late, and insists upon trading stamps, defendant will give stamps in order to retain good will.

41. That the cost of such an examination of charge account bills would be prohibitive and would result in the store being compelled to abandon giving trading stamps with all articles.

42. That in 1936, 223,657,145 individual stamps could have been issued if requested by defendant's customers.

43. That in 1936, 143,144,825 stamps were actually issued to customers of defendant's, being 64 percent of the stamps which might have been issued by the company, if requested.

44. That in the year 1937, 229,687,480 stamps could have been issued if requested, but 146,037,074 were actually issued or 63.6 percent of the total number of stamps that might have been issued, if requested.

45. That defendant's experience shows that about 95 percent of those stamps that are issued are redeemed.

46. That many of the customers do not desire stamps and throw the slips which would entitle them to stamps on the floor of the store.

47. That the trading stamps issued by defendant in and of themselves have no value, although, when 990 of them have been pasted in the stamp book, along with the 10 stamps given with the book, they may then be exchanged for an article or articles of value.

48 That the trading stamps issued in connection with sales of plaintiff's products of themselves cannot be redeemed for any article of value. Such redemption can be

made only after 990 of the stamps have been pasted in the stamp book furnished for that purpose. To obtain 990 stamps in ordinary course, it is necessary to purchase $99 worth of merchandise.

49. The Sun Ray Drug Company, which maintains a chain of cut rate, cash and carry, drug stores in Philadelphia, is one of the retail dealers handling plaintiff's products which complained to plaintiff because defendant was issuing trading stamps to purchasers of plaintiff's products. It also complained because defendant, in accordance with its long-established business practice, gave free delivery to said products and permitted such products to be purchased by customers having charge accounts.

50. That the retail dealers who complained to plaintiff about the issuance of trading stamps by defendant threatened to "do something" to meet defendant's competition, but they did not threaten to cancel their contracts with plaintiff and they did not discontinue or threaten to discontinue buying and handling plaintiff's products.

51. That no evidence was offered to show that defendant's competitors had suffered any damage, or that plaintiff's business had in any way been affected or threatened to be affected, or that its trade-mark had been or was about to be damaged, or that the public had been or was being misled.

52. That defendant's business would be disrupted and defendant would probably sustain substantial and perhaps irreparable damage if an injunction were issued prohibiting defendant from issuing trading stamps with plaintiff's products according to defendant's long-existing business practice of issuing such stamps upon request with all merchandise purchased at its store.

### Discussion

Fair Trade Acts have been passed by 43 States within the last few years. Of these States 40 adopted such acts in 1935 and 1937. This amazing concert of action within such a brief period arouses interest in the background

which made such speedy, wholesale action possible. In an article entitled Fair Trade Acts, 86 U. of P. L. R. 803, 807, James Angell McLaughlin, Professor of Law at Harvard Law School, makes the following illuminating statements:

". . . the basic theory of construction of the Sherman Act on which the *Hartman* case might have rested was renounced by the court that had proclaimed it with vehemence; but nothing impaired the conclusion (1) that a resale price maintenance program was a violation of the Sherman Act when it eliminated competition between distributors in interstate trade or (2) that it was unenforceable at common law when it achieved a like result in local trade. . . .

"The reaction from the strict anti-trust law against resale price maintenance was unceasing agitation by distributor groups for statutory change in the law. One of the ablest early economic studies of resale price maintenance discussed public policy upon the assumption that manufacturers were endeavoring to impose their will upon the distributing trade, and the same assumption has underlain a large part of the discussion of judges and lawyers. The most distinctive feature of the price maintenance movement of the 1930's, however, has been distributor initiative. It now appears that most manufacturers are comparatively inert. . . .

"The federal law against resale price maintenance was not doomed to be demolished by a frontal attack, however. A flanking movement through the state legislatures proved to be much more effective. A California Statute of 1931, with extended sanctions added by amendment in 1933, was made the basis of a rapid and sweeping campaign through the states. Several states enacted it with the reproduction of a typographical error which rendered one passage altogether unintelligible. Early in 1937, the Druggists' Association presented an improved and elaborate draft, which was thenceforth faithfully followed, some legislatures going to the trouble promptly

thus to bring their 1935 service up to date. This movement encountered no serious opposition or detailed theoretical criticism. . . . When the United States Supreme Court upheld the Illinois and California Acts, the rout of the previous policy was virtually complete. The laggard legislatures climbed on the band wagon until forty-three acceded, and Congress adopted and the President (reluctantly, it is said) signed the Miller Tydings Act, exempting from the Sherman Act resale price maintenance contracts lawful in the state where the resale is to be made. . . .

"The generally accepted facts that the Fair Trade Acts have been largely promoted by associations of druggists and that the drug trade has been exceptionally successful in availing itself of the Acts may well invite speculation concerning the causes for this exceptional success. . . . Drugs have naturally tended to be branded products. Several simple chemicals, such as carbon tetrachloride, are sold at extravagant prices under trade names by reason of the natural ignorance of the consuming public in matters of chemistry. The drug business, whether operating as an aid to the physician or as the mere distributor of quack potions, has always partaken heavily of the mumbo jumbo of the 'medicine-man'. There are few lines in which the customer has less idea of what he is getting and less means of knowing whether he has had his money's worth when all is said and done. . . .

"Furthermore, the influence of self-hypnosis upon health is such that it is frequently impossible to say whether the addict of advertised drugs who considers himself benefited, has not actually offset physiological damage by psychological regeneration. Probably enough has been said to emphasize that consumer ignorance tends to render the drug field the happy hunting ground of the 'fair trade' propagandist. . . .

"Private advices from the drug trade, however, long before the current decade, have portrayed the independent druggists' associations as pressure groups seeking to

induce manufacturers to promulgate resale price maintenance programs. It is by no means fantastic to postulate the case of a manufacturer driven into 'cooperation' and resale price maintenance by aggresive action of distributors encompassing mass diversion of patronage suggestive of the boycott. . . .

"Writers believing that free competition is as doomed as laissez-faire generally insist upon governmental responsibility for the establishment of alternative mechanism for the control of economic activities. The Fair Trade Acts offer no such control. Viewed in their most obvious light as a direct product of high pressure political lobbying by groups asserting narrow and unenlightened interests, they present a definite challenge."

And in note 69 on page 820 it is further stated:

"The steam roller has shown signs of bogging down in New York, however, in the demoralized fields of razors, radios and liquors. Defendants have shown that complainants were price cutting or that injunctions would have only capricious operation. Gillette Safety Razor Co. v. Green, 99 N. Y. L. J. 1559, 106 C. C. H. Trade Reg. Serv. ¶25,117 (N. Y. Sup. Ct. Mar. 30, 1938) ; Cooper v. Davega-City Radio Corp., N. Y. Times, Apr. 19, 1938, p. 23, col. 1 (N. Y. Sup Ct. 1938). A preliminary injunction was denied in the *Nussbaum* case, *supra.* See 106 C. C. H. Trade Reg. Serv. ¶25,087 (N. Y. Sup. Ct. 1937). See also Schenley Distributors v. Nussbaum Liquor Store, 106 C. C. H. Trade Reg. Serv. ¶25,086 (N. Y. Sup. Ct. 1937). And a New Jersey Chancellor has exercised his discretion to refuse an injunction where the complainant had refused to sell to defendants on the theory that such refusal was a failure to 'do equity'. Lentheric, Inc., v. Weissbard, 122 N. J. Eq. 573, 195 Atl. 818 (Ch. 1937)."

The Pennsylvania Fair Trade Act was approved June 5, 1935. It is a duplicate of the act passed by all of those States which adopted a Fair Trade Act prior to 1937. The second section of the act, under which section relief is sought in the present case, provides:

"Section 2. Wilfully and knowingly advertising, offering for sale, or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section one of this act, whether the person so advertising, offering for sale, or selling is, or is not, a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

This section is in derogation of the common law. Proceedings to restrain a purchaser of trade-marked goods from reselling them at a price less than that fixed by the owner of the trade-mark and others, with knowledge of the terms of the contract, could not successfully have been maintained in Pennsylvania prior to the passage of the above act. See Garst v. Wissler, 21 Pa. Superior Ct. 532 (1902).

The Statutory Construction Act of May 28, 1937, P. L. 1019, which prescribes rules for the interpretation of Pennsylvania statutes, expressly provides that all statutes enacted prior to its effective date, in derogation of the common law, shall be strictly construed. See clause 8 of section 58. Therefore, according to the rules of construction laid down by the State legislature in 1937, the Fair Trade Act of 1935 must be construed strictly.

As an aid to the proper, strict construction of the 1935 act, it will be enlightening to see what abuses that act, and similar acts passed by other State legislatures, were intended to correct. An examination of the available literature on the subject shows these abuses were predatory price cutting and the use of "loss leaders." "Loss leaders" are standardized articles, having a general appeal and a medium price and of a type frequently displayed for purchase, which are selected by merchants for advertisement and sale at prices below their cost. Purchasers, knowing the customary prices for these articles, are thereby attracted into the stores of the price cutters who expect that customers, believing other articles are similarly reduced, then will purchase such other articles and pay therefor prices high enough to overcome the price

reductions of the "loss leaders." This method of doing business became prevalent during the depression. Articles which were trade-marked and nationally advertised at a standard price readily lent themselves as bait to attract customers when sold at a sharp reduction.

In Zorn & Feldman on Business Under the New Price Laws (1937), it is stated in chapter XVIII, Resale Price Maintenance, at pages 276-77, as follows:

"Recent price maintenance legislation reflects primarily the effort of drug distributors and manufacturers to curb price cutting. The group which supported similar efforts in the formulation of the N R A Codes, and which is now most active in sponsoring State fair trade laws and Federal price maintenance legislation, is composed of manufacturers, wholesalers and retail distributors of drugs, cosmetics, proprietary remedies and toilet preparations. In this industry the various component branches have adopted a united front. . . .

"Until very recently, chains were opposed to any form of price maintenance. During the depression, however, the rapid increase in the growth of the new price cutting outlets such as 'super-markets' and cut rate stores, greatly affected the volume and profits of some chains, notably in the drug and food trades. As a result, some of these mass distributors, especially in the drug field, have joined the independents in advocating price maintenance."

In Report of the Federal Trade Commission on Resale Price Maintenance, volume 1, General Economics and Legal Aspects (U. S. Govt. Printing Office 1929), Prevalence of "leader" or "bait" Merchandising (p. 29):

"It is strongly urged by those favoring resale price maintenance that the common practice of retailers offering certain goods at cut prices is done as bait to attract purchasers who will buy other goods returning higher prices and profits. Price maintenance is advocated as a means of eliminating such use of trademarked or identified goods."

In an article in 24 Cal. L. R. 640, entitled Experience in California with Fair Trade Legislation Restricting Price Cutting (1936), the author discusses the Fair Trade Law of California, passed in 1931 and amended May 8, 1933, Cal. Stats. p. 793. The California Act of 1933 was the model for the Pennsylvania Act of 1935. In discussing the experience in California with the Fair Trade Act, the author states (p. 660):

"The full meaning of the developments since 1933 cannot be grasped without reference to the price conditions in the drug trade in the bottom of the depression. Cut rate selling had long been prevalent in the trade; the depression gave it general popularity, particularly in the metropolitan centers, and often in smaller outlying points. The limited service, low price types of establishments thrived as the price conscious consumers thronged to them in increasingly larger numbers. Especially because many, perhaps most, of the independent service stores preferred to hold prices rather than enter into drastic price wars. Advertising pages were filled with bargain offers in which comparative price appeals were dominant. In addition, it appears that many offered bait merely for the purpose of luring customers into stores. There can be little doubt that healthy price competition became heavily infected with unfair practices."

In Seligman & Love, Price Cutting and Price Maintenance (1932), chap. IX, The Effects on the Retailer, the authors state (p. 162):

"Inasmuch as the drug industry offers a picture of the most characteristic and the most extreme forms of price cutting, we have made an intensive field of investigation of the actual conditions. . . .

"The drug industry illustrates, perhaps better than any other, the widespread systems of price cutting in each of the four major types of retail outlets that have been mentioned in the previous chapter. The department stores, the chain stores, the ordinary cut-rate stores and the in-

dependent outlets are all well represented. Each class utilizes from time to time temporary sales at low prices, and in each we find retailers who sell the merchandise at continuously low levels. Above all, each of these outlets has found in the promotion of the private brands a great opportunity to supplement its activities in reducing prices on advertised goods" (p. 163).

See also Report of the Hearing before Subcommittee of the Committee of the Judiciary, United States Senate 74th Congress, Second Session on S-3822, a bill to amend the act entitled "An act to protect trade and commerce against unlawful restraints and monopolies", approved July 2, 1890, 26 Stat. at L. 209. Edward S. Rogers, Chicago, Ill., representing the National Association of Retail Druggists, in a statement before the committee said (p. 10):

*"The Necessity for Resale Price Maintenance*

"As competing channels of distribution developed with the increase of merchandising, competition between them became very keen. Price cutting became the chief competitive weapon, and products under trademarks or brands well-known to the consumer were obviously best adopted to the price cutter's purpose. The greater 'saving' he could offer the public on goods, the standard value of which the public knew, the more likely was the price-cutter to get customers out of his competitors' stores and into his own. More often than not, his competitors retaliated and a price war was on."

Counsel for defendant stated in their briefs that they had been unable anywhere, in the history of this fair trade legislation, to find that any consideration had been given to the widely-established business practices of offering free delivery, free charge accounts, and trading stamps with sales of trade-marked articles. If any references, indicating that consideration was given to these matters, were found by counsel for plaintiff, such fact was not called to the attention of the chancellor.

The issuance of trading stamps upon the request of the customers, pursuant to a continuous business policy followed over a period of more than 30 years, with all merchandise sold by the defendant, is clearly neither predatory price cutting nor the use of a "loss leader." It is not part or parcel of either of the abuses which the Fair Trade Acts sought to remedy.

Furthermore, as indicated by Professor McLaughlin in his article on the Fair Trade Acts, supra, early in 1937 the Druggists' Association presented an improved and more elaborate draft of a Fair Trade Act which was thereafter faithfully followed by the legislatures of 17 States in adopting fair trade legislation in 1937 and 1938.

These States are Maryland, Oregon, Minnesota, Montana, North Carolina, South Dakota, Arkansas, Connecticut, Florida, Georgia, Idaho, Indiana, Kansas, Utah, Virginia, West Virginia, and Wyoming.

The clauses added to the revised act, among other things, provide: "The offering or making of any concession of any kind whatsoever, whether by the giving of coupons or otherwise, in connection with any such sale . . . shall be deemed a violation of such resale price restrictions for which the remedies prescribed by section . . . of this Act shall be available."

From this revision it may be inferred that the sponsors of the fair trade legislation, and the legislatures of the 17 States, entertained serious doubts as to whether the Fair Trade Acts, as originally drawn, similar to the Pennsylvania act, were broad enough to prevent such practices as the giving of trading stamps with purchases of merchandise. That conclusion is further strengthened by the fact that some of the legislatures, which in 1935 had adopted an act similar to the Pennsylvania act, in 1937 amended their acts so as to include the provision above quoted.

It may therefore be assumed that, if the legislature of Pennsylvania had intended to prohibit the giving of trad-

ing stamps with merchandise, it would have so provided, and that, if the failure so to provide had been a mere oversight in 1935, the legislature would have corrected such oversight in 1937 when the legislatures of 16 other States adopted the Druggists' Association's latest .revisions. This conclusion is further strengthened by the fact that there are more than 3,000 stores in Pennsylvania which issue trading stamps with merchandise, which fact must have been known in a general way to the legislature and no doubt was known in detail by the Druggists' Association.

There is a vast difference between the services offered to customers by retail stores. The so-called "cash and carry" stores offer practically no service. The customers must pay cash and must carry away the merchandise they buy. At the other extreme, we have large department stores, like defendant. Among the services defendant offers its customers are a large store conveniently located in the center shopping district of the city, free parking for customers arriving by automobile, free telephone service to the store for customers living in the suburbs, free delivery service within a radius of 100 miles of Philadelphia, free medical care and hospitalization in the store, free alterations to men's clothing, purchases on the instalment plan, charge accounts on which no interest is charged, free gift boxes and special wrappings, and free trading stamps with all purchases whenever they are requested by the customer. In the one case nothing is offered to make the purchasing of merchandise an easy, pleasant thing and in the other case everything is offered to please the customer and to create good will.

It is obvious that, if the arguments advanced by plaintiff are carried to their extreme, all retail business in trade-marked articles must be reduced to the brutally stark basis of the "cash and carry" stores and the courtesies, gracious accommodations, and friendly services which most civilized beings expect and demand of their shopkeepers and merchants must be discarded.

That this is not the conjuring up of an impossible situation is demonstrated by the fact that the testimony of one of plaintiff's witnesses disclosed that at least one of the three dealers, who complained to plaintiff that defendant was issuing trading stamps with plaintiff's merchandise, also complained because plaintiff was giving free delivery service and was permitting purchases of such merchandise on charge accounts.

By way of answer, plaintiff contended that free delivery and similar items fall within the field of service and have no definite relation to the price, whereas trading stamps are issued in direct proportion to the price paid. But all of the courtesies, services, and privileges extended by a store like defendant's must bear a definite relation at least to the total volume of purchases made or they might become so extravagant they could no longer be maintained; and certain of the services, such as credit accounts and instalment buying, do have a direct relation to the actual prices paid by the customer receiving such services.

In the present case it has been established that defendant has in good faith followed the business of issuing trading stamps for more than 30 years. It has regarded the issuance of these stamps as an item of advertising and the cost of the stamps has always been charged on its books to advertising expense and never to the cost of merchandise. There is abundant authority to support defendant's view that trading stamps are a medium of advertising.

In Ex parte Hutchinson, 137 Fed. 950, the court quoted with approval at page 951 from Hewin et al. v. City of Atlanta, 121 Ga. 723, as follows:

" 'In its ultimate analysis, the use of trading stamps by a merchant is simply a unique and attractive form of advertising, resorted to for the purpose of increasing trade. In the strict commercial sense of the term "business," it is not a business at all. It is simply a mode or manner of business—an instrumentality or incident of a

business. When resorted to for the purpose of increasing the business to which it is annexed, it occupies the same relation to that business as newspaper advertising, circulars, dodgers, and the like' ".

In Sperry & Hutchinson Co. v. Louis Weber & Co., 161 Fed. 219, the court at page 220 adopted complainant's contention that its trading stamps had become known "as a valuable medium for advertising."

In Sperry & Hutchinson Co. v. Mechanics' Clothing Co., 135 Fed. 833, the court stated at page 834:

"A trading stamp is not ordinary property. It is sui generis. . . . The merchant, in a certain sense, is the agent of the company in issuing the stamps to the public. The merchant gets such trade advantage as results from his distribution of the stamps. . . . In the transaction between the company and the merchant, the stamp, once issued, represents so much advertising furnished and paid for. Once issued by the merchant, it is functus officio as a token of the sale and use of so much advertising." The court continued:

"As a token or voucher of the sale and use of so much advertising, the trading stamp is necessarily a consumable article—an article designed for a single use in an advertising scheme." On page 836 the court continued:

"When once given out by a merchant, they have served the advertising purpose for which they were intended".

Defendant does not issue stamps automatically with every purchase, but only in cases where the customer requests stamps, in which event the purchaser receives a slip which must be carried to a separate department of the store where the stamps are issued. If the customer has been buying on a charge account, the customer on receiving the bill must request stamps and pay the bill when due in order to obtain them. The customer must obtain 990 stamps and paste them in a stamp book and then take the book to the premium room of the Yellow Trading Stamp Company, which is an entirely inde-

pendent compainy maintaining its own premises. There the customer may select an article in exchange for the book and is then required to carry such article home or pay for its delivery. A customer, receiving a few trading stamps cannot exchange them for anything, but must wait until sufficient stamps have been accumulated to fill the stamp book, which requires purchases aggregating $99.

Trading stamps are requested of defendant in connection with only 65 percent or less of the purchases made in defendant's store. Of the trading stamps so obtained, only about 95 percent are redeemed. Many customers throw their purchase slips on the floor and never ask for stamps. Trading stamps are never advertised in connection with any particular merchandise—there is merely a general statement in defendant's advertisements that trading stamps are given with all merchandise sold by defendant. Defendant does not at any time issue with any article more than the customary one stamp for each 10 cents of the price thereof.

Defendant justifiably feels that its business has been built up and depends to a great extent upon this custom of issuing trading stamps when requested. It believes that its customers would resent this discontinuance of those stamps. It showed to the satisfaction of the chancellor that it could not discontinue issuing trading stamps solely on the products manufactured by plaintiff. Its customers would be annoyed and disgruntled by any change in the uniformity of defendant's trading stamp policy. On the other hand, prices on fair trade articles could not be raised above the standard price, to cover cost of delivery, charge accounts, or trading stamps, because the public is too price conscious. Lastly, defendant has approximately 100,000 active charge accounts each month covering purchases of from 500,000 to 600,000 articles and it would require a tremendous clerical staff to check through these articles to determine on which pur-

chases stamps could be, and on which stamps could not be, issued.

In this particular case plaintiff has failed to show that it either has sustained or will sustain any injury or damage as a result of defendant's continuing to issue trading stamps. In the language of one of plaintiff's executive officers who testified on its behalf, the retail dealers who complained to plaintiff merely stated that, if plaintiff did not stop the issuance of trading stamps by defendant, they "would be forced to meet the competition." He also stated "they were going to do something to meet the competition", but he admitted that he did not know just what they were going to do. There was no evidence that any dealers had canceled, or threatened to cancel, their contracts with plaintiff, or that they had refused to buy any further merchandise from plaintiff, or that plaintiff had suffered any damage at all. If any of these dealers attempt hereafter to carry out their threats and, as a result of so doing, violate the Fair Trade Act, they can immediately be enjoined by plaintiff. It is difficult to see, therefore, how plaintiff has sustained or is likely to sustain any real damage.

After having been advised by defendant that it did not consider its practice of issuing trading stamps to be a violation of the Fair Trade Act, plaintiff nonetheless continued to accept orders from defendant and to supply it with merchandise. There was no contractual relation between plaintiff and defendant and plaintiff, had it desired to do so, could have stopped selling its products to defendant. It may be inferred from these facts that plaintiff did not consider that it was sustaining any substantial or irreparable damage. It may well be that, as suggested by Professor McLaughlin, plaintiff in instituting these proceedings was yielding to pressure exerted by competitors of defendant.

As an illustration of the "steamroller" tactics referred to by Professor McLaughlin in his article on Fair Trade

Acts, supra, it appears that Nevin Drug Company, which objected to the issuance of stamps by defendant, after making such complaints, started to give out profit-sharing coupons. Immediately plaintiff filed a bill in equity. Defendant entered no appearance and filed no answer, admitting that it had no defense, and a decree pro confesso was entered, presumably in form satisfactory to plaintiff and, we assume, to the liking of defendant—no doubt for use as a precedent in the present litigation. There appears to the chancellor, however, to be a vast difference between setting up a profit-sharing coupon device for the express purpose of violating the act, and defendant's continuing to issue trading stamps in accordance with its long-established policy and under the conditions above set forth.

Therefore, the chancellor finds that the issuance of trading stamps by defendant with all merchandise sold by it, upon request of its customers, and in accordance with its long-established custom, is not a violation of the Pennsylvania Fair Trade Act strictly construed, as it must be, in accordance with the Act of 1937.

Furthermore, the chancellor is of the opinion that, even if such issuance of trading stamps did constitute a violation of the act, no injunction should be issued in the present case because the injury to plaintiff, if any, is slight, whereas the damage to defendant caused by a restraining order might well be substantial and irreparable—certainly out of all proportion to the benefits which plaintiff might derive from the issuance of such order.

It is well established that the weapon of injunction may be afforded a complainant or withheld by the chancellor in the exercise of sound discretion, and that injunctive relief should not be granted where the injunction would result in no substantial benefit to plaintiff and great harm to defendant.

The chancellor is of the opinion that the bill in equity should be dismissed at the cost of plaintiff.

*Conclusions of law*

The chancellor draws the following conclusions of law:

1. That section 2 of the Pennsylvania Fair Trade Act is in derogation of the common law and must be strictly construed.

2. That defendant's delivery of trading stamps upon request, in accordance with its long-established business practice, with its resale of goods purchased from plaintiff at the resale price fixed by plaintiff, is not in violation of the Pennsylvania Fair Trade Act.

3. That trading stamps, when issued in good faith with all merchandise and not as a subterfuge for the purpose of evading the Fair Trade Act, are a form of advertising in the same category as free delivery service, free charge accounts, free parking, and the like.

4. That the purpose of the Pennsylvania Fair Trade Act was to prevent predatory price cutting and "loss leaders" and defendant's issuance of trading stamps is not within the purport of the act.

5. That the fact that plaintiff continued to sell and deliver its products to defendant for resale by it, after defendant had notified plaintiff that it did not regard its issuance of trading stamps as a violation of the Fair Trade Act and that it would therefore not discontinue issuing such stamps, may be considered as bearing upon plaintiff's attitude in instituting this litigation and also as bearing upon the question as to whether any substantial or irreparable damage was either being sustained or threatened.

6. That if defendant were enjoined from issuing trading stamps with plaintiff's products, it would compel defendant entirely to discontinue the issuance of trading stamps, one of the basic and long-established policies on which defendant's business has been founded. The advantage which might be obtained by plaintiff is slight as compared with the substantial damage which would be done to defendant.

7. That plaintiff has not presented any proof that it has either sustained or been threatened with any substantial or irreparable damage.

8. That plaintiff's bill in equity should be dismissed at the cost of plaintiff.

### Decree nisi

And now, to wit, June 24, 1938, it is ordered, adjudged, and decreed:

1. That the bill of complaint is hereby dismissed.

2. That the costs of these proceedings shall be paid by plaintiff.

The prothonotary is directed to enter this decree nisi, and to give notice thereof to the parties or their counsel, and unless exceptions thereto are filed within 10 days thereafter, either party may present a form of final decree to be entered in the case.

Exceptions to the foregoing adjudication were dismissed by the court in banc on December 16, 1938, in Bristol-Myers Co. v. Lit Brothers, Inc. (No. 2), p. 530.